Our next case is Mylan Pharmaceuticals and MSN Laboratories v. Bausch Health Ireland, 2024, 1011 and 1053. Mr. Kong, alright, please proceed. Thank you, Your Honor. Good morning. May it please the Court. A single conservative substitution at a known finite point of interest in a peptide to create another peptide that has the same essential function is about as straightforward and easy as it gets when it comes to peptide chemistry. But it's a different compound. It's a different peptide, yes. It's a different compound. It is a different peptide with one single solution that was pointed out in the prior art. Alright, so there is perhaps a prima facie case as was found by the board. Correct. And then the board found that there were unexpected properties and that's sort of a basic aspect of pharmaceutical patent law. It is, and if I could dig into those unexpected properties, Your Honor. The data set provided by Bausch is incomplete and it led to a number of legal errors committed by the board, some of which they erred upon, some of which they didn't address. But when those issues are sorted out, what it boils down to is a failure by Bausch to meet their burden of production regarding that data set. Among the holes that exist in that data set, there's no information regarding the amount of Form A that was used in the Uruguayan sample. And Form A, of course, is the active topoisomer. Form B is inactive. So the more A isomer you have in your sample, the more potency you're going to see in the results. But we don't know what was the composition of those samples because they didn't produce that data. So we should be fact-finders and probe into all the details of their determination? No, Your Honor, I'm not saying that. What I was about to pivot to was that the board let them off the hook with regard to that failure to meet their burden of production. And one of the ways they did that was to define the closest prior art as being any mixture of A and B-Uruguanan as it naturally exists. And by allowing any mixture of A and B-Uruguanan to be a comparator, what the board allowed was a comparison to lesser prior art. As I mentioned before, the more Form A you have in a sample, the more potent it's going to be. The less Form A you have in a sample, the less potent it's going to be. But because that definition of the closest prior art includes inferior versions of Uruguayan that are known to be less potent, the board erred because this court's precedent clearly holds that any comparison must be to the closest prior art, not to inferior prior art. Did Bausch-Fallot, I don't recall, argue that the closest prior art would just be the wild-type human Uruguayan? Or did it argue that, or acknowledge that, an A-Form version of human Uruguayan would be the closest prior art, but as a practical matter, you just can't ever really get a clean test on pure A-Form human Guadaline because even during the testing process, there's going to be some instability where it interconverts into B-Form. And that was the argument below, was that interconversion means that you can't have pure A-Form as the comparator. But interconversion can be controlled, and the board found as much in its motivation analysis. Interconversion can be controlled by stabilizing the, first of all, you isolate the isomer to 99% purity, and you can store it in powder form for up to a year and keep it stable. And so, go ahead. Another question I have is then, it seems like everybody agrees that SP-304, as it's reported out in Table 4 of the patent, in Column 16, SP-304 is a purified up to 95% A-Form of the Glu-3 claimed invention. And if that's right, then why wouldn't the SP-301, that's also reported in Table 4, likewise be a greater than 95% purified A-Form of human Guadaline? Sure. So the SP-304, what we've said, and this is based on Bausch's statements to the EPO, is that the SP-304 was purified A-Form plicanotide. So we weren't relying on that statement regarding purity in the patent, because you're looking at Column 15 right now, I think. And that statement regarding purity doesn't say topoisomeric purity. It just says purity. And so they're excluding other peptides. They're not isolating a particular topoisomer of a single peptide. And if your honor looks at the footnote to that sentence, they refer to the Klott reference. And this is important, because Klott discusses a method of synthesizing peptides and purifying them. And one of the peptides that he synthesized and purified was human uroguanilin. That's peptide 14 in Klott. And what Klott says after his discussion of synthesis and purification is that he found two topoisomers of human uroguanilin. And so that word purify in the specification, as it refers to Klott, it does not mean isolating a topoisomer. It means excluding the presence of other peptides. Well, the patent does talk about how these peptides were custom synthesized, right? Correct. So the sp301 human uroguanilin version, it's a synthesized form of it. It's not just grabbed from nature. It's not removed from urine or plasma. That's correct. And then it further says it's not only custom synthesized, but it was purified at greater than 95% purity. Of the peptide. It says nothing about topoisomeric purity. The word topoisomer or confirmer is nowhere near that sentence. But I'm just trying to understand if we all agree that the sp304 reported in Table 4 is greater than 95% APORN, then why wouldn't it be true for the sp301? Because, like I just said, if you look at the Klott reference, which is what that sentence is referring to, it was synthesized in accordance with a disclosed method. That's the Klott paper. What Klott discusses is that after he synthesized and after he purified, he found both topoisomers. And so he can't be referring to topoisomeric purity, because Klott doesn't discuss that, nor does the patent itself. But, you know, I think greater than 95% purity accounts for the fact that there's going to be a little bit of something else in there. Impurities or other peptides, yes. So, I mean, just because some B-form is found after the testing, I mean, I think that goes to the point of the other side on the board, which is, as a practical matter, you're not going to undertake these tests with an A-form team in Guantanamo without reporting out some B-form, because it's just unstable. It's going to do some interconversion during the process. And if we accept that as being true, and we use your 95% figure, Your Honor, that doesn't sync with what the board found regarding what the closest prior art is. They said it's any mixture. And so any mixture could include a very little bit of A-form and a lot of B-form, or half and half, and that's far below the 95% standard Your Honor just laid out. And so by defining the prior art, the closest prior art, that broadly as a practical matter, what the board allowed is a comparison to inferior prior art. Well, the one thing I'll agree with is that it's a little less than clear whether the board said it's definitely got to be a purified A-form human guantanamo. But I don't think it went so far to say, you know, any version of human guantanamo, you know, even a 50-50 A-form, B-form is good enough. That I don't think it's true. I would push back on that respectfully, Your Honor, and that's because what the board said was as it naturally exists, and it naturally equilibrates to a one-to-one ratio of A to B. And so I think they did have that in mind. And if you look at the citations that they included. The evidence that they looked at, including Table 4, SB 301, is showing something else about this purification. Something else about the purification? So I apologize, Your Honor, I don't follow that. SB 301. I mean, the point is we're up here at this point under a substantial evidence standard of review. And so I don't know how much more we can get into the weeds of trying to discern what is the correct takeaway of a silent clock reference in this patent. The board's already made a pretty good finding. What I would say to that, Your Honor, is if the question of what is the closest prior art is addressed correctly, because the board did err on that, to be the purest A-form you can get of your guantanamo, then that shines a spotlight on this burden of production. Because there is no information that they produced that allows us to conclude that the sample they used met that standard. You had argued in your brief that the difference here was a CH2, a methylene group, which is quite a small difference. And now you're saying that's not the closest prior art? No, I'm saying your guantanamo is the closest prior art. But there are different mixtures of the A and B form of your guantanamo. The A-form has the activity, so the higher the concentration of the A-form in the sample that you're testing, the more potency you're going to see. But they both have the same structure. They both have the same structure. That is correct, Your Honor. They're just configured differently in a three-dimensional space. And that apparently has a difference with regard to how they interact with the receptor here. And so if we were to redefine the closest prior art as being pure form A or as close as you can get to it, again, it's their burden to produce information that allows us to tell that their sample met that. And they can't do that. So we don't know what the comparison was that they made? Yes, Your Honor. That's exactly right. The one sentence they leaned on was what Judge Chen pointed out, was the word purity. And they leaned very heavily into that sentence. But, again, the word purity refers to the exclusion of other peptides. It doesn't refer to topoisomeric purity. There's no reason to think that it does. And I also add the Board did not make that finding below that that's what that sentence means. Well, why is there no reason to think that it does refer to A-form purity? When you say there's no reason to think that it does refer to A-form purity, why would you say that? Because there's no mention of isolating a topoisomer in that patent. And I point out that Bausch received a later patent that claimed a pure form A plicanotide. And so in this patent, they can't be discussing that because they later claimed it. And that patent has a later expiration date as well. And so the purification process they're talking about was not what they discussed in the later patent. It's what was discussed in CLOP. You're into your rebuttal. You can use it or save it. I apologize. I'll save it, Your Honor. Thank you. Mr. Haskell. Thank you very much, Judge. May it please the Court. Your Honors, Mylan's arguments regarding closest prior art, commensurate in scope, and unexpected superior properties do not warrant reversal of the board.  So what was the comparison that was made? Was it A-form to A-form or not? The comparison, Your Honor, that was made was to human uroguanulin as it naturally exists. And the board correctly considered, Your Honor, that human uroguanulin naturally interconverts between and exists as a mixture of two topoisomers. In other words, we don't know what the mixture was that was involved in the comparison. We don't know the exact number, but irrespective of that, it represents the closest prior art. Had it been a 50-50 mixture, Your Honor? So in other words, if we were to say the closest prior art is the A-mixture, no such comparison was made. If Your Honor were to say that the closest prior art were purified human uroguanulin, is that your question? A-form, yes. Yes, then Bausch did test against purified human uroguanulin because the peptides, all those peptides were purified to 95% or greater. Okay, but let's assume for a moment that they're right. Purified doesn't mean purified 95% A-form. It just means purified human uroguanulin peptide. So let's assume that purified doesn't mean purified 95% A-form. It just means that purified doesn't include other peptides. Then Bausch still tested against the closest prior art because it is a purified form of human uroguanulin. Wait, wait, wait, but it's not, we don't know, other than the use of the word purified here, whether the comparison was A-form to A-form, right? We know that the comparison was to a purified version of human. Don't answer my question. We don't know whether the comparison was A-form to A-form. You mean A-form of plicanotide to A-form of human uroguanulin? Yes. So that is ultimately what the test is getting at. What's the test when you say the test is getting at? So the test that Bausch conducted, Your Honor, the test for T. That's what we're trying to figure out.  We're trying to figure out two things. One is, did Bausch actually use a purified A-form of human uroguanulin to put up against a purified A-form of plicanotide? Yes, Your Honor. Then if so, did the board appreciate that? Did the board make a fact-finding? I mean, it's unclear to me from what the board said whether it understood that the closest prior art that needed to be examined was a purified A-form. The factual finding, respectively, that the board made was that the closest prior art is human uroguanulin as it naturally exists. Okay, stop right there. As it naturally exists, that sounds like wild-type human uroguanulin. So Bausch did not test against wild-type human uroguanulin, Your Honor. However, had Bausch tested against wild-type human uroguanulin with… Well, then you would agree, wouldn't you, that testing against wild-type human uroguanulin would not be the closest prior art? That actually would reflect the closest prior art as well, Your Honor. Well, now I'm getting a little confused. You're saying two different things. The other side is saying the closest prior art is a purified A-form version of human uroguanulin. And I thought we heard you just earlier say that you agreed with that, that that is the closest prior art. So… With the recognition that there's going to be some interconversion to B-form during the testing process, blah, blah, blah. But nevertheless, the starting material you would use as the closest prior art would be a purified A-form of human uroguanulin. That's what I remember hearing you say before. Then 40 seconds ago, I heard you say something else, that just as it exists in nature, human uroguanulin would be the closest prior art. Those are two different things, though. Which one is it? So either could reflect the closest prior art, Your Honor. And as the tests are conducted, you're determining the difference. So now it's making it even less clear to me which version did the board think was the closest prior art. Maybe the board thought it could have been either one of them. And then if that's the case, the question becomes, is it correct to think a wild-type, naturally existing human uroguanulin could be regarded as a closest prior art when it was known in New York that you could get an extra purified A-form version of human uroguanulin? And maybe that would be the true apples-to-apples comparison to a purified A-form of prokaryote. So respectfully, Your Honor, the issue with trying to get human uroguanulin perfectly pure, it would be chemically difficult, if not impossible, to get it 100% pure. But at least you're trying to. People had done that in the art, and in fact those attempts did produce some close to purely purified version, but nevertheless it's altered and synthesized and different from how it exists in nature. Only at certain temperatures, Your Honor, would it be able to resist interconversion. At really low temperatures it could resist interconversion, but naturally there will be some interconversion on the board at appendix. Look, what was the comparison? Was the comparison between the wild-type A to the gluten A, or was the comparison something else? How do we know what the comparison was? The comparison, Your Honor, as the tests were conducted, the peptides were purified to greater than 95% purity. Okay, but what does purified to 95% mean is the question here. How do we know that that's A-form to A-form? Because that's how human uroguanulin, when human uroguanulin naturally exists, it interconverts, and the board made that finding based on the prior art and the testimony of Dr. Davis and Dr. Waldman, including the Chino reference, appendix 4293. Did those witnesses testify that the test was run on the pure A-form human uroguanulin? Those witnesses testified that— No, no, answer the question. Yes, no. They did not testify that the tests were run against 100% pure human uroguanulin. Did they testify that it was 95%? Where did they testify that? Those at appendix 38 to 39, it cites their testimony. Just show me. Their testimony, Your Honor, is going to be at paragraphs 67 through 68 of 1 of— Dr. Davis's testimony is paragraphs 67 through 68. What page are we talking about? So that's going to be Joint Appendix 4812 to 4813, Your Honor. 4812? Okay. And Dr. Waldman's testimony in that regard.  4812, where does he say that it's purified to 95%? You make these representations, you can't even find the testimony that supports them. He's testifying at paragraphs 67 and 68, Your Honor, about the interconversion. Where does he say it's purified to 95% type A? So the patent respectfully says that, Your Honor. No, no, no. You said that your witnesses said it. Where does the witness say it? Well, I'm going to assume that there's no such testimony. Let's move on. Okay. Well, going back to the patent itself, which talks about a greater than 95% purity. Yes, Your Honor. On its face, there's some ambiguity as to what that means. Could it be 95% A form versus 5% less or less than B form? Or does it mean something more broadly, like 95% human guano, that amino acid sequence, vis-a-vis other possible peptides? Respectfully, Your Honor, Bausch's own tests show that the purification process will remove the topoisomers, and that was part of the unexpected results that Bausch showed. So when these peptides are purified by HPLC... I'm trying to understand how to interpret this text at column 15. How do we know it's either one or the other? How do we know it's 95% A form versus 5% or less B form? It's at least 95% A form because the HPLC process does remove the inactive topoisomers. You're testifying. You're testifying. I asked you where the testimony was and you couldn't find it. So the topoisomeric purity, Your Honor, it was the stability against interconversion test that Bausch ran, and they were able to, in fact, record, copy-pasted in the opinion, a graph that shows separation of the human-Uruguayan inactive topoisomer. That is... That's Appendix 41. So Appendix 41 shows a graph where HPLC was run on samples of human-Uruguayan and sp304-plicanotide, and the inactive fraction there represents the inactive topoisomer, and that shows that the HPLC process, in fact, does separate the inactive from the active topoisomer, and they ran HPLC. There's more than one set of data showing purportedly unexpected activity. Were all of those sets of data based on one standard? Were they based on different standards? They were. They were based, Your Honor, on the procedure that is set forth in columns 15 and 16 of the patent, and the data there are shown in Table 4. Well, looking at 41 in this graph, we don't know what the starting material was, right? The starting material would have been human-Uruguayan as it naturally existed. And what does that mean? 50-50 wild-type? Depending on the temperature, depending on the pH, it could be as low as 50-50, or it could be— So then the starting material was not a purified version? Well, so I apologize, Your Honor. So the starting material in this particular experiment, they did custom synthesize them. Custom synthesize to create what? To create human-Uruguayan, to create— Well, an A-form, a purified A-form? To 95% or greater, yes, Your Honor. And how do we know that? Because they showed through HPLC that it was 95% or greater. They ran them through HPLC. The HPLC separates the— And where can we find that in the record? Where it's like, I did an HPLC test, and voila. What I did, I created a 95% purified A-form version of human-Uruguayan. And so the inventor did put in a declaration, Your Honor, to that effect, and that inventor declaration is, I believe, Appendix 5599. 5599. Yes. Yes, it is, Your Honor. Appendix 5599, paragraph 9. Yeah, but he doesn't say that 95% purified means 95% A-form. Based on the use of HPLC, that would be what was understood. How do I know that? Where does he say it? He didn't spell it out in that level of detail, Your Honor. I apologize. So, maybe you have two arguments. Argument one is, yes, you agree, the closest prior art would be starting with a very purified, maybe not completely purified, but a very purified A-form version of human Guam, and you have the evidence to back that up. But it also sounds like you have some kind of backup argument that even if it's not a starting material of a very purified version of A-form human Guam, nevertheless, as it exists in nature, whatever that looks like would also be the closest prior art. Is that your backup argument? Those both could reflect the closest prior art, Your Honor, yes. And so what would be the case for why the backup argument makes sense? I see that I'm out of time. May I answer your question? Please, please, please. Your Honor, had Bausch actually tested against wild-type human uroguanulin, the 50-50, having total isomeric purity of only 50 percent, their results would have actually shown a much greater difference against human uroguanulin, as the inactive portion of human uroguanulin does not have activity. Okay. But it also sounded like you had agreed that it was already known in the prior art that you could make very purified A-form versions of human Guam. Only at certain low temperatures, because it's going to naturally interconvert. Depending on the temperature, depending on the pH, it will interconvert between the active and the inactive total isomer. It's stable in the powder form, right? Excuse me, Your Honor? It's stable in the powder form, right? There would be potentially even some interconversion there. It would have to be at an extremely low temperature, presumably. And all of this temperature sensitivity concern that you're expressing now, was that mentioned in the briefing below? I just don't remember. It's kind of a discussion of, well, getting to the closest prior art, the ideal closest prior art is actually kind of a tricky thing. And so, by tests, we believe it's a good faith effort to do the best we could under these conditions. The way I would characterize it, Your Honor, is this is a compound that naturally interconverts. And there was evidence of pH sensitivity to that. In fact, that was part of the evidence of unexpected results. Where's the evidence that it interconverts in powder form? I don't believe it was tested in powder form, Your Honor. Is this patent expired? No, Your Honor. This patent has, with patent term extension and patent term adjustment, an expiration date of January 30th, 2028. I see. Which doesn't show on the face of the patent. Correct, Your Honor. You got PTA? Correct, Your Honor. Okay, PTA of 362 days. Correct. And PTE of, I don't have it memorized off the top of my head, but it gets close to it. It goes out to January 2028, Your Honor. Thank you, counsel. Thank you very much, Your Honor. Mr. Kong has some rebuttal time. Almost four minutes if you need it. Yes, Your Honor. Thank you. I wanted to respond, Judge Chin, to your two questions. Number one, did Bausch use pure form A uroguanulin? The answer we just heard is nobody knows. Nobody knows because they didn't provide that data, and any ambiguity on that falls in their lap. It was their burden of production. They needed to produce that evidence. They're leaning heavily on this word purity in the patent and in this declaration. Again, I won't repeat this. The word topoisomer, the word confirmer, there's no reason to believe that that purity is referring to topoisomeric purity. Again, if you follow the clot reference, which you can because the board did not make any findings on this. There's no substantial evidence standard here. If you follow the clot reference, he discusses finding two topoisomers of human uroguanulin. So if that's the synthesis method that they used to make what they tested, it was a mixture of A and B. It wasn't pure form A. The second question is, did the board make that finding? I think I just answered that. The board did not make that finding in terms of what they did. Rather, the board had a broad definition for what was the closest prior art, and that obviated their need to make that finding. Lastly, I want to point to the data that my friend on the other side pointed to. This is page 41, appendix 41. This is the acid stability test. This is the data from time point 16 hours. And as your Honor pointed out, there's no data from time point zero. So we don't know what the starting material was or how to interpret this data. Because absent data at time point zero, we don't know what this means. We have to compare this to something to see how much interconversion actually occurred. And we can't do that. But I guess doesn't that graph that we're all looking at prove that they didn't use wild-type natural uroguanolin of a 1-to-1 A-to-B ratio? Because it's a 70-to-30 ratio of A form to B form. So given that we know that uroguanolin does interconvert, and here we've got a 16-hour test, it probably stands to reason that it could be 80 or 90 percent A form uroguanolin. If we assume the test worked as it was supposed to work, which there's no evidence that it did because all we have is data at time point 16, if we make that assumption, then I hear your Honor's point, then they probably started something higher than 70-30, or maybe they started with 70-30 and nothing changed. We don't know. So that doesn't solve the problem. That's some version of purification, I would think. 70-30? Maybe not to the extent you would want it, obviously. I would argue that is inferior prior art because it is going to be less potent than the more potent, as pure as you can get at form A. If there are further questions, I see the remainder of my time. Thank you, Counsel. The case is submitted. Thank you, Your Honor.